IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
DEC 28, 2017
U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| MAINE COMMUNITY HEALTH OPTIONS, | ) ) ) |
| Plaintiff, | ) ) Case No. 17-2057 C |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, | ) **COMPLAINT** ) |
| Defendant. | ) ) ) |

Plaintiff Maine Community Health Options ("Plaintiff" or "Health Options") brings this action against the United States ("Defendant" or "Government") seeking damages and other relief for the Defendant's: (1) violation of its cost-sharing reduction ("CSR") payment obligations required by Section 1402 of the Patient Protection and Affordable Care Act ("Section 1402"), codified at 45 C.F.R. § 156.430 ("Section 156.430"); and (2) breach of its CSR payment obligations under an implied-in-fact contract. This action seeks damages in the amount of the CSR payments the Government owes Plaintiff for benefit year 2017. In support of this action, Plaintiff states and alleges as follows:

**NATURE OF ACTION**

1. In March 2010, Congress enacted the Patient Protection and Affordable Care Act[1] and the Health Care and Education Reconciliation Act[2] (collectively, the "Affordable Care Act," "Act," or "ACA").

---

[1] Pub. L. No. 111-148, (March 23, 2010), 124 Stat. 119.
[2] Pub. L. No. 111-152, (March 30, 2010), 124 Stat. 1029.

2.      The Act represented a major shift in health care coverage and regulation in the country, with the principal objective of making comprehensive and affordable health insurance available to tens of millions of then-uninsured Americans.

3.      To accomplish its aims, the ACA ushered in a host of market-wide reforms and requirements affecting the private health insurance industry.  Among other things, the Act addressed the scope of covered services, availability of coverage, renewability of coverage, out-of-pocket costs for consumers, pricing, and other coverage determinants.  The Act limits health insurance product variation and restricts pricing and underwriting practices.  For example, by placing restrictions on the premium spread based on the age of the policy holder, the Act ensures that premiums are based on community rating (*i.e.*, the risk pool posed by the entire community) instead of an assessment of an individual's health status.  The Act also provides for guaranteed issuance of coverage and renewability of coverage.

4.      The ACA requires individuals to purchase coverage if they are not otherwise insured, but it also created a support system of federal subsidies to offset the costs of coverage.  The ACA's individual mandate, coupled with the availability of federal subsidies, was designed to realize the ACA's twin goals of increasing both the availability and affordability of health insurance coverage.  Together, they dramatically increased the number of individuals—many previously uninsured—purchasing health insurance.  To help serve the vastly expanded pool of individuals seeking coverage, the ACA also established health insurance exchanges—online marketplaces where individuals and small groups may purchase health insurance.  Created by Title I, Subtitle D of the ACA, the health insurance exchanges "are designed to bring together buyers and sellers of insurance, with the goal of increasing access to coverage" offered in a competitive marketplace.

5.      Health insurance issuers selling insurance on the exchanges are required to offer qualified health plans in the individual and small group markets. A qualified health plan ("QHP") is a health plan that meets certain standards established by the Centers for Medicare & Medicaid Services ("CMS") in order to be sold to consumers through the exchanges.

6.      The ACA classifies plans offered on the exchanges into one of four metal levels—silver, gold, platinum, and bronze—based on their cost-sharing requirements—coinsurance, copayments, and deductibles a policyholder must pay out-of-pocket until satisfying a maximum in a benefit year[3] as established by regulation. 42 U.S.C. § 18022(d); 45 C.F.R. § 156.130.

7.      A "silver" plan is a plan structured so that the insurer pays approximately 70% of the average enrollee's health care costs, leaving the enrollee responsible (before the application of the subsidy) for the other 30% through cost sharing. 42 U.S.C. § 18022(d). Under the ACA, an insurer must reduce cost sharing for eligible individuals enrolled in "silver" plans through an exchange. *Id.* § 18071(c)(2).

8.      In a "gold" or "platinum" plan, the insurer bears a greater portion of health care costs, while under a "bronze" plan, the insurer is responsible for a lower portion of those costs. *Id.* An insurer that offers coverage on an exchange is required to offer at least one plan at both the "silver" and "gold" levels of coverage. *Id.* § 18021(a)(1)(C)(ii). The ACA does not require insurers to reduce cost sharing for individuals enrolled in "gold," "platinum," or "bronze" plans.

9.      To realize the goal of making affordable health insurance available to low- and moderate-income Americans, the ACA, among other things, established an integrated program of

---

[3] A "benefit year" is "a calendar year for which a health plan provides coverage for health benefits." 45 C.F.R. § 155.20.

subsidies to defray both the premium expenses and out-of-pocket costs of health insurance with two main components: premium tax credits and cost-sharing reductions.

10. First, Section 1401 of the ACA provides premium tax credits for qualified individuals with household income between 100% and 400% of the federal poverty level who purchase health insurance through the exchanges established by the Act. 26 U.S.C. § 36B. Because these tax credits are refundable, they can subsidize insurance purchased by individuals who have no income tax liability. *See* Congressional Budget Office ("CBO"), *Refundable Tax Credits* at 1 (Jan. 2013), *available at* www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/43767_RefundableTaxCredits_2012_0_0.pdf. The vast majority of individuals who buy insurance on an exchange rely on advance payments of these premium tax credits. *See King v. Burwell*, 135 S. Ct. 2480, 2493 (2015).

11. Second, and most pertinent here, Section 1402 of the ACA requires insurers to provide "cost-sharing" reductions to individuals who are determined eligible to receive tax credits under Section 1401 and whose household income is below 250% of the federal poverty level. 42 U.S.C. § 18071(c)(2), (f)(2). As noted above, "cost-sharing" refers to out-of-pocket payments to health care providers in the form of copayments, coinsurance, and deductibles that individuals are typically required to pay under their insurance plan. *See* CBO, *Key Issues in Analyzing Major Health Insurance Proposals* at 15-17 (Dec. 2008), *available at* www.cbo.gov/publication/41746.

12. Insurers, in turn, are guaranteed by the ACA to be reimbursed by the Government for the cost-sharing reductions they pay to their insureds. Specifically, the ACA requires that the Secretaries of Health and Human Services ("HHS") and the Treasury "***shall make*** periodic and timely payments to the [QHP] issuer equal to the value of the reductions." 42 U.S.C.

§ 18071(emphasis added).  These advance payments are made directly to health insurance issuers.  *Id.* at § 18082(a)(3).

13.　The statutory guarantee of reimbursement is one of the ACA's lynchpins.  If insurers are not compensated by the Government for making the required cost-sharing reductions for eligible individuals enrolled in silver plans as required by the statute, insurers have no ability to adjust premiums mid-year to capture the statutory obligation to pay providers the enhanced coverage of the CSRs.  In other words, carriers are left to meet their obligations *and* the Government's obligations due to the Government's refusal to meet its statutory obligations.

14.　Health Options is the largest writer of individual health insurance in the State of Maine.  Consistent with the ACA's intended mission for Consumer Operated and Oriented Plan ("CO-OP"),[4] Health Options insures individuals and groups in industries that have typically lacked insurance coverage or have been underinsured:  farmers, fishermen, artists, sole proprietors, and small businesses.  Health Options also worked with various social service agencies to connect people who have serious chronic conditions to offer coverage.  For example, Health Options' 2017 enrollment includes the vast majority of all patients with HIV/AIDS who accessed marketplace coverage.

15.　Maine insurance regulations do not permit health plans, such as Health Options, to raise premiums mid-benefit year (as opposed to prospectively) to cover the cost of providing the cost-sharing reductions.

---

[4] Congress created the CO-OP program in ACA Section 1322, which explicitly states that "the purpose of the CO-OP program [is] to foster the creation of qualified nonprofit health insurance issuers to offer qualified health plans in the individual and small group markets[.]" 42 U.S.C. § 18042(a)(2).

16.     In an October 12, 2017 memorandum, HHS Acting Secretary Eric Hargan informed CMS that "CSR payments to issuers must stop, effective immediately."[5] According to the memorandum, this instruction was premised upon a legal opinion of the U.S. Attorney General concluding that the CSR program lacked a valid appropriation.

17.     The Government's failure to pay CSR reimbursements deprives QHP issuers, including Health Options, of money to which they are entitled by statute on account of their performance in the exchanges for benefit year 2017.  CBO estimated CSR payments of approximately $7 billion for fiscal year 2017.[6]  Regardless of whether Congress appropriated sufficient funds to HHS to make the CSR payments, the Government's statutory obligation to make such payments, and Plaintiff's right to those payments, remain.

18.     By this lawsuit, Plaintiff seeks full payment of the CSR payments it is entitled to under the ACA and that the Government currently owes.  The law is clear, and the Government must abide by its statutory obligations.  Plaintiff respectfully asks the Court to compel the Government to do so.

## JURISDICTION

19.     This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491.  The statutory cause of action giving rise to this Court's Tucker Act jurisdiction is Section 1402, a money-mandating statute that requires payment from the federal government to QHP issuers that satisfy certain criteria.  Section 156.430 is a money-

---

[5] Oct. 12, 2017 Mem. from E. Hargan to S. Verma re Payments to Issuers for Cost-Sharing Reductions (CSRs), *available at* https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf
[6] *See* CBO, Federal Subsidies Under the Affordable Care Act for Health Insurance Coverage Related to the Expansion of Medicaid and Nongroup Health Insurance: Tables from CBO's January 2017 Baseline at 4, *available at* https://www.cbo.gov/sites/default/files/recurringdata/51298-2017-01-healthinsurance.pdf.

mandating regulation that implements Section 1402 and thus also obligates payment from the federal government to QHP issuers that satisfy certain criteria.  *See* 45 C.F.R. § 156.430.

20.  In the alternative, the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101 *et seq.*, a money-mandating statute, provides Plaintiff a cause of action that gives rise to this Court's jurisdiction pursuant to the Tucker Act.

21.  This controversy is ripe because HHS has refused to pay Plaintiff the full amounts owed for CSRs as required by Section 1402, Section 153.460, and the parties' implied-in-fact contract.

## PARTIES

22.  Plaintiff, Health Options, is a nonprofit corporation organized under the laws of Maine, with its principal place of business in Lewiston, Maine.

23.  Health Options is a member-led QHP issuer on the exchanges in the State of Maine.  It is organized as a nonprofit under the CO-OP model and offers comprehensive health insurance benefits to individuals, families, and businesses in Maine.  Its stated mission is to partner with members, employers, and providers to create affordable, high-quality benefits that promote health and wellbeing.  Health Options is the State of Maine's only nonprofit CO-OP insurer and the only nonprofit issuer on the marketplace that is domiciled in Maine.

24.  Health Options began providing affordable, high-quality health plans in Maine in 2014.  Since commencing business, Health Options' enrollment grew to over 75,000 members at its peak, making it the largest writer of individual health insurance in the State of Maine.  In its first year of operations, Health Options attracted over 80 percent of the exchange enrollment in Maine.  But for Health Options' existence, there would have been only one carrier on Maine's individual marketplace in 2014, and this is also true for 2018.  Currently, Health Options insures

the biggest share of the individual on-exchange market in Maine, and has attracted over half of the State's individual marketplace for the 2018 benefit plan year.

25. Health Options conducted and participated in over a thousand outreach and educational sessions throughout Maine on the availability of coverage through the ACA, the mechanics of the marketplace, and the benefit plans offered by Health Options. Health Options has focused its outreach broadly across its entire service area, including many rural parts of the State.

26. To improve accessibility of information on access to health care, Health Options has teamed with the Lobstermen's Association and run articles in its trade newsletter, participated in farming conventions and related trade shows, and participated in various events targeting uninsured and under-insured individuals.

27. In short, Health Options has aggressively pursued the ACA's goal of connecting the people in its service area to insurance coverage opportunities with the understanding that a broader base of insured is better for the individuals within the pool and the overall functioning of the marketplace.

28. The Defendant is the Government, acting through CMS (or CMS's parent agency HHS). Unless otherwise noted, references in this Complaint to CMS include HHS where applicable.

## FACTUAL ALLEGATIONS

### A. The Affordable Care Act Established a Cost-Sharing Reduction Program with Advance Payment Obligations

29. The Affordable Care Act imposed certain obligations on the federal government to help incentivize the participation of private insurers, stabilize premiums, and induce the uninsured to purchase health insurance coverage. Relevant to this dispute, the ACA established

a cost-sharing reduction subsidy, paid preemptively to certain qualified insurers, to facilitate the core statutory mission of providing affordable health care to low- and moderate-income Americans.

30. Section 1402 of the Affordable Care Act, as codified at 42 U.S.C. § 18071, created the CSR program.  In relevant part, that Section states:

> (a) IN GENERAL.—In the case of an eligible insured enrolled in a qualified health plan—
>
>> (1) the Secretary shall notify the issuer of the plan of such eligibility; and
>>
>> (2) the issuer ***shall reduce*** the cost-sharing under the plan at the level and in the manner specified in subsection (c).
>
> [ . . . .]
>
> (c)(3) Methods for Reducing Cost-Sharing
>
>> (A) In general.  An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and ***the Secretary shall make periodic and timely payments*** to the issuer equal to the value of the reductions.

*See* 42 U.S.C. § 18071(emphasis added).

31. HHS implemented the CSR payments in the Code of Federal Regulations at 45 C.F.R. § 156.430.  In relevant part, Section 156.430 states that "[a] QHP issuer ***will receive periodic advance payments*** based on the advance payment amounts calculated in accordance with § 155.1030(b)(3) of this subchapter." (emphasis added).  Section 155.1030(b)(3) and other regulations set forth the calculation methodologies applicable to CSR payments.

32. Following the ACA's implementation, the Government established a CSR reimbursement schedule under which the Government would provide the required periodic advance payments to QHP issuers.  *See* 42 U.S.C. § 18082; 45 C.F.R. § 156.430(b)-(d).  The reimbursements are then periodically reconciled to the actual amount of cost-sharing reductions

9

made to enrollees and providers. 45 C.F.R. § 156.430(c). Specifically, CMS established "a payment approach under which HHS would make monthly advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."[7] "After the close of the benefit year, QHP issuers must submit to HHS information on the actual value of the cost-sharing reductions provided" and HHS "would then reconcile the advance payments and the actual cost-sharing reduction amounts."[8] Finally, the Government would reimburse the QHP issuer "any amounts necessary to reflect the CSR provided or, as appropriate, the issuer [would] be charged for excess amounts paid to it."[9]

### B. QHP Issuers Participated in Exchanges and Set Prices in Reliance on the Cost-Sharing Reduction Payments

33. For QHP issuers to participate on the marketplaces for the 2017 benefit year, they had to submit their premiums to the appropriate state or federal regulatory authority during May 2016 and submit a signed Qualified Health Plan Issuer Agreement ("QHPIA") to CMS by the end of September 2016.[10] Health Options timely submitted a signed QHPIA, and by doing so committed itself to offering health insurance coverage on the exchange for benefit year 2017. Because the QHPIA has limited termination rights, and because terminating the QHPIA under

---

[7] CMS, HHS Notice of Benefit and Payment Parameters for 2014 (Mar. 11, 2013), at 7, *available at* https://www.cms.gov/CCIIO/Resources/Files/Downloads/payment-notice-technical-summary-3-11-2013.pdf.
[8] *Id.*
[9] CMS, Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 (Mar. 16, 2016), at 28, *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf; *see also* 45 C.F.R. 156.430(e).
[10] CMS, Key Dates for Calendar Year 2016: QHP Certification in the Federally-facilitated Marketplaces; Rate Review; Risk Adjustment and Reinsurance (Dec. 23, 2015), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Final-2016-key-dates-table-April-2016.pdf.

any circumstance does not obviate the issuer's obligations under state law to continue coverage for enrollees who purchased the plan, Health Options' commitment to the 2017 marketplace was effectively irrevocable as of the end of September 2016.[11]

34. Health Options committed itself to participating in the marketplace in 2017 with the express understanding—based on the plain text of Section 1402 and the Government's actions in previous benefit years—that, for those plans that required the issuers to reduce cost-sharing obligations of the enrollee, the Government would honor the statutory mandate, *i.e.*, "***the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions***." And in fact, in accordance with that understanding, the Government made monthly advance payments from January 2014 up and until October 2017. It was not until October 12, 2017—over a year after Health Options had committed itself irrevocably to the 2017 exchange—that the Government first announced that it would not make CSR payments for the remainder of the 2017 benefit year.

C. **Appropriations for Cost-Sharing Reduction Reimbursements**

35. Section 1401 of the ACA added a new section to the Internal Revenue Code that provided eligible insureds with premium tax credits to cover their health insurance premiums. 26 U.S.C. § 36B. The ACA also amended 31 U.S.C. § 1324, which establishes a permanent appropriation of "[n]ecessary amounts . . . for refunding internal revenue collections as provided by law," including "refunds due from" specified provisions of the tax code. 31 U.S.C. § 1324. Specifically, Section 1401 of the ACA amended the list in Section 1324 to include "refunds due from" Section 36B. 26 U.S.C. § 36B. Until October 2017, the Government relied on the appropriation in Section 1324 to pay amounts owed under both Sections 1401 and 1402.

---

[11] *See* 45 C.F.R. § 147.106(b).

36.     In its April 2013 budget request to Congress for fiscal year 2014, the Office of Management and Budget ("OMB") included a request for a line-item appropriation designating funds for the payment of cost-sharing reductions. *See* Fiscal Year 2014 Budget of the United States Government, Appendix at 448 (Apr. 10, 2013). The same day, HHS separately submitted its justification to congressional appropriations committees stating that "CMS requests an appropriation in order to ensure adequate funding to make payments to issuers to cover reduced cost-sharing in FY 2014." *See* HHS, Fiscal Year 2014, CMS, Justification of Estimates for Appropriations Committees at 184 (Apr. 10, 2013).

37.     Congress did not provide the line-item appropriation requested by HHS. *See* S. Rep. No. 113-71, 113th Cong. at 123 (July 11, 2013). Congress never repealed or amended the CSR provision, however, and the October 2013 legislation references the existence of CSR reimbursements. *See* Continuing Appropriations Act, 2014, Pub. L. No. 113-46, Div. B, § 1001(a), 127 Stat. 558, 566 (Oct. 17, 2013) (requiring HHS to certify that a program was in place to verify that applicants were eligible for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available").

38.     In January 2014, HHS began making monthly advance payments to reimburse QHP issuers for cost-sharing reductions,[12] relying on Section 1324 as the appropriation for these payments.[13]

---

[12] *See* CMS, Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 (Mar. 16, 2016), at 27 ("Payments to issuers of estimated monthly amounts began in January 2014."), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf.

[13] *See* Letter from Sylvia M. Burwell, Dir., OMB, to Senators Ted Cruz and Michael S. Lee, at Responses p. 4 (May 21, 2014), ("cost-sharing subsidy payments are being made through the advance payments program and will be paid out of the same account from which the premium (Continued...)

39. Congress has never included any language in appropriations or other bills preventing HHS, CMS, or the Treasury from accessing certain funds or accounts to make CSR payments.

### D. Legal Challenge By House of Representatives

40. On November 21, 2014, the U.S. House of Representatives (the "House") filed a complaint against HHS and the Treasury, in which it sought an injunction preventing the executive branch from "making any further Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted." *See* Compl. at ¶ 27, *House v. Burwell*, Case No. 1:14-cv-01967-RMC, Dkt. 1 (D.D.C. filed Nov. 21, 2014). In its complaint, the House argued that "Congress has not, and never has, appropriated any funds (whether through temporary appropriations or permanent appropriations) to make any Section 1402 Offset Program payments to Insurers." *Id.* at ¶ 28. The Government moved for summary judgment, asserting that 31 U.S.C. § 1324 provided a permanent appropriation for both Section 1401 premium tax credits and Section 1402 CSR reimbursements. *See* Defs.' Mem. ISO Mot. for Summ. J., *House v. Burwell*, Case No. 1:14-cv-01967-RMC, Dkt. 55-1 (D.D.C. Dec. 2, 2015) at 11.[14] The district court ruled in favor of the House and entered an injunction preventing any further reimbursements under Section 1402, but stayed the injunction pending resolution of any appeal. *House v. Burwell*, 185 F. Supp. 3d 165 (D.D.C. 2016).

---

tax credit portion of the advance payments for that program are paid"), *available at* http://www.cruz.senate.gov/files/documents/Letters/20140521_Burwell_Response.pdf.

[14] In its summary judgment briefing papers, the Government expressly acknowledged that the ACA "requires the government to pay cost-sharing reductions to issuers" and that "[t]he absence of an appropriation would not prevent the insurers from seeking to enforce that statutory right through litigation." Defs.' Mem. ISO Mot. for Summ. J., *House v. Burwell*, Case No. 1:14-cv-01967-RMC, Dkt. 55-1 (D.D.C. Dec. 2, 2015) at 20. Moreover, the Government acknowledged that prevailing insurers "can receive the amount to which it is entitled from the permanent appropriation Congress has made in the Judgment Fund. . . . The mere absence of a more specific appropriation is not necessarily a defense to recovery from that Fund." *Id.*

41. The Government appealed the ruling to the D.C. Circuit. In November 2016, the House asked the court of appeals to hold the case in abeyance to "provide the President-Elect and his future Administration time to consider whether to continue prosecuting or to otherwise resolve this appeal." Appellee's Mot. to Hold Briefing in Abeyance, *House v. Burwell*, Case No. 16-5202, Dkt. No. 1647228 (D.C. Cir. Nov. 21, 2016) at 1-2. The D.C. Circuit granted the request and the appeal remained in abeyance until Friday, December 15, 2017, when the parties announced that they had reached a settlement providing for the parties to request that district court's decision case to be vacated.

### E. The Government's Newly Announced Refusal to Reimburse CSRs

42. Although the Government continued to make CSR reimbursements for most of 2017, it decided in October 2017 to stop doing so, arguing that 31 U.S.C. § 1324 could not be used to fund CSR reimbursements. The Department of Justice concluded that Section 1401 premium tax credits and Section 1402 CSR reimbursements were two distinct programs, and the permanent appropriation in Section 1324 only provided funding for the Section 1401 premium tax credits. *See* Oct. 11, 2017 Ltr. from Att. Gen. Sessions to Secretary of Treasury and Acting Secretary of HHS. The next day, HHS announced that it would stop making CSR reimbursements "until a valid appropriation exists." Oct. 12, 2017 Mem. from E. Hargan to S. Verma re Payments to Issuers for Cost-Sharing Reductions (CSRs).

### F. Plaintiff Has Suffered Substantial Harm as a Result of The Government's Refusal to Pay Amounts Owed

43. Health Options is a nonprofit insurer that invests millions of dollars in community endeavors designed to establish adequate health standards. It further promotes expansive benefits coverage and superb quality in its health care model and has provided coverage to traditionally underserved populations, particularly rural communities.

44.     QHP issuers are required by state and federal regulations to set their ACA-related health insurance rates well before the year they become effective.  These unreimbursed costs are enormous.  The CBO estimates that CSR reimbursements to QHP issuers will be $7 billion in fiscal year 2017, $10 billion in 2018, and rise to $16 billion by 2027.[15]  An April 2017 study analyzing the potential effect of ending CSR reimbursements predicted that "[m]any insurers might react to the end of subsidy payments by exiting the ACA marketplaces.  If insurers choose to remain in the marketplaces, they would need to raise premiums to offset the loss of the payments."[16]

45.     As an October 13, 2017 joint statement from America's Health Insurance Plans and Blue Cross and Blue Shield Association noted, the decision to end CSR reimbursements has "real consequences," including that "[c]osts will go up and choices will be restricted."[17]  These effects are currently playing out in every major ACA exchange across the country.

46.     Health Options is not immune to these harms, and in fact has already suffered, and will continue to suffer, their effects.  Like other QHP issuers, Health Options was owed monthly CSR reimbursements in October 2017, November 2017, and December 2017 that have not been paid.  By the Government's own accounting, Health Options is owed $5,651,672.49[18]

---

[15] *See* CBO, Federal Subsidies Under the Affordable Care Act for Health Insurance Coverage Related to the Expansion of Medicaid and Nongroup Health Insurance: Tables from CBO's January 2017 Baseline at 4, *available at* https://www.cbo.gov/sites/default/files/recurringdata/51298-2017-01-healthinsurance.pdf.

[16] Larry Levitt, Cynthia Cox, and Gary Claxton, *The Effects of Ending the Affordable Care Act's Cost-Sharing Reduction Payments*, Kaiser Family Foundation, Apr. 25, 2017, *available at* https://www.kff.org/health-reform/issue-brief/the-effects-of-ending-the-affordable-care-acts-cost-sharing-reduction-payments/.

[17] Kristine Grow, *Health Plans Issue Joint Statement Regarding Funding for Cost-Sharing Reduction Benefits for Millions of Americans*, American Health Insurance Plans (AHIP), Oct. 13, 2017, *available at* https://www.ahip.org/joint-statement-regarding-funding-for-crs/.

[18] $1,912,401.71 for October 2017; $1,890,782.79 for November 2017; and $1,848,487.99 for December 2017.

in unpaid CSR reimbursements for 2017. Like other QHP issuers, Health Options is still required by law to provide cost-sharing reductions to eligible insureds, despite not receiving the mandated reimbursement from the Government. This has caused Health Options and other QHP issuers to suffer large financial losses. It also leads to instability in the insurance markets and hinders Health Options' and other QHP issuers' ability to design and price plans effectively for the ACA exchanges.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Violation of Statutory and Regulatory Mandate to Make Payments)

47. Plaintiff realleges and incorporates the above paragraphs 1-46 as if fully set forth herein.

48. As part of its obligations under Section 1402 of the ACA and/or its obligations under Section 156.430, the Government is required to pay any eligible QHP the applicable cost-sharing reductions mandated by the ACA.

49. Plaintiff is an eligible QHP issuer under the ACA, and based on its adherence to the ACA and its notification of cost-sharing reduction amounts to CMS, satisfied the requirements for payment from the Government under Section 1402 of the ACA and Section 156.430.

50. The Government has failed to perform as it is obligated under Section 1402 of the ACA and Section 156.430, and has affirmatively stated that it will not satisfy those obligations as required by the statute.

51. The Government's failure to provide timely payments to Plaintiff is a violation of Section 1402 of the ACA and Section 156.430, and Plaintiff estimates that it has suffered

$5,651,672.49 in damages in payments for benefit year 2017 as a result of the Government's actions.

## COUNT TWO

### (Breach of Implied-In-Fact Contract to Make Payments)

52. Plaintiff realleges and incorporates the above paragraphs 1-51 as if fully set forth herein.

53. Plaintiff entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely CSR payments to Plaintiff in exchange for its agreement to become a QHP issuer and participate in the health care exchanges.

54. Section 1402 of the ACA, HHS's implementing regulations, the Government's actions in making CSR payments for benefit years 2014, 2015, 2016, and nine months of 2017, and the actions of agency officials with authority to bind the Government regarding their obligation to make CSR payments constitute a clear and unambiguous offer by the Government to make full and timely CSR payments to health insurers, including Plaintiff, that agreed to participate as QHP issuers in the ACA marketplaces.  This offer evidences a clear intent by the Government to contract with Plaintiff.

55. Plaintiff accepted the Government's offer by agreeing to become a QHP issuer, accepting the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the ACA and proceeding to provide health insurance on the health care exchanges. Plaintiff satisfied and complied with its obligations and conditions that existed under the implied-in-fact contract.

56. The Government's agreement to make full and timely CSR payments was a significant factor material to the decision of Plaintiff to participate in the health care exchanges.

57. The parties' mutual intent to contract is further confirmed by the parties' conduct, performance, and statements following Plaintiff's acceptance of the Government's offer, and the Government's repeated assurances that full and timely CSR payments would be made.

58. The implied-in-fact contract was also supported by mutual consideration: the CSR's reimbursement to alleviate the financial requirement that QHP issuers were forced to bear under the ACA was a critical consideration that significantly influenced Plaintiff's decision to become a QHP issuer and participate in the exchanges. Plaintiff, in turn, provided a real benefit to the Government by agreeing to become a QHP issuer and participating in the exchanges, as adequate insurer participation was crucial to the Government achieving the overarching goal of the ACA exchange programs—to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases in premiums.

59. The Government induced Plaintiff to participate in the health care exchanges in part by including the CSR payments in Section 1402 of the ACA and its implementing regulations, by which the Government committed to make health insurers whole financially for the mandated cost-sharing reductions.

60. The Government repeatedly acknowledged its commitments to provide financial assistance to QHP issuers and its obligations to make full and timely CSR payments to qualifying issuers through its conduct and statements to the public and to Plaintiff, made or ratified by representatives of the Government who had express or implied actual authority to bind the Government.

61. The Government's failure to make full and timely CSR payments to Plaintiff is a material breach of the implied-in-fact contract, and Plaintiff has suffered damages estimated to be $5,651,672.49 for benefit year 2017.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

  A. That the Court award Plaintiff $5,651,672.49, the amount to which Plaintiff is entitled under Section 1402 of the Affordable Care Act and Section 156.430;

  B. That the Court award pre-judgment and post-judgment interest at the maximum rate permitted under the law;

  C. That the Court award such court costs, litigation expenses, and attorneys' fees as are available under applicable law; and

  D. That the Court award such other and further relief as the Court deems proper and just.

December 28, 2017                  Respectfully submitted,

OF COUNSEL:  
Daniel Wolff  
Xavier Baker  
Skye Mathieson  
Monica Sterling  
CROWELL & MORING LLP  
1001 Pennsylvania Avenue, NW  
Washington, DC 20004  

*/s/ Stephen McBrady*  
Stephen McBrady  
CROWELL & MORING LLP  

1001 Pennsylvania Avenue, NW  
Washington, DC 20004  
Tel: (202) 624-2500  
Fax: (202) 628-5116  
SMcBrady@crowell.com  

*Counsel for Maine Community Health Options*

## CERTIFICATE OF SERVICE

I certify that on December 28, 2017, a copy of the forgoing Complaint was filed electronically using the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing will be served on Defendant's Counsel via the Court's ECF system.

> _/s/_ Stephen McBrady
> Stephen McBrady
> CROWELL & MORING LLP
> 1001 Pennsylvania Avenue, NW
> Washington, DC 20004
> Tel:  (202) 624-2500
> Fax:  (202) 628-5116
> SMcBrady@crowell.com