**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| MAINE COMMUNITY HEALTH OPTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-2057C |
| v. | ) | Chief Judge Margaret M. Sweeney |
| | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S CROSS-MOTION TO DISMISS**

## TABLE OF CONTENTS

I.   THE EXISTENCE OF A STATUTORY PAYMENT OBLIGATION
     UNDER SECTION 1402 IS A SEPARATE QUESTION FROM THE
     QUESTION OF WHETHER AN APPROPRIATION HAS BEEN MADE. .....................6

II.  THE GOVERNMENT OFFERS NO VIABLE BASIS TO DISREGARD
     THE PLAIN LANGUAGE OF SECTION 1402, CREATING AN
     OBLIGATION, BASED ON CONGRESS'S MERE LACK OF
     APPROPRIATED FUNDS...........................................................................................10

     A.   Congress Did Not Pass Any CSR Appropriation Riders, so the
          Government's Reliance on *Moda's* Discussion of Appropriation
          Riders and Legislative "Intent" Is Misplaced. ........................................10

     B.   The Government's Various Theories for Equating the Absence of an
          Appropriation With the Absence of a Payment Obligation Are Without
          Merit..........................................................................................................11

          1.   The comparison between Sections 1401 and 1402 does not
               address the issues here. .............................................................. 12

          2.   The Government's "increasing premiums" theory is erroneous.............. 14

     C.   Recovery of Amounts Due From the Government's Failure to Make
          CSR Payments Are Actionable in the Court of Federal Claims. ...........15

III. THE GOVERNMENT IS LIABLE FOR BREACH OF AN IMPLIED-IN-
     FACT CONTRACT.....................................................................................................18

CONCLUSION........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agwiak v. United States*,
    347 F.3d 1375 (Fed. Cir. 2003)......................................................................17

*Baker v. United States*,
    50 Fed. Cl. 483 (2001) ...............................................................................19

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).............................................................................17, 18

*Cal. Fed. Bank, FSB v. United States*,
    245 F.3d 1342 (Fed. Cir. 2001)..................................................................21

*Collins v. United States*,
    15 Ct. Cl. 22 (1879) .....................................................................................7

*Durant v. United States*,
    16 Cl. Ct. 447 (1988) .................................................................................22

*Eastport S. S. Corp. v. United States*,
    372 F.2d 1002, 1009 (1967).......................................................................17

*Ferris v. United States*,
    27 Ct. Cl. 542 (1892) ...................................................................................7

*Fisher v. United States*,
    402 F.3d 1167 (Fed. Cir. 2005)..........................................................5, 16, 17

*Gibney v. United States*,
    114 Ct. Cl. 38 (1949) .................................................................................14

*Greenlee Cty., Ariz. v. United States*,
    487 F.3d 871 (Fed. Cir. 2007)...............................................................16, 17

*Hanlin v. United States*,
    316 F.3d 1325 (Fed. Cir. 2003)..................................................................19

*Indian Harbor Ins. Co. v. United States*,
    704 F.3d 949 (Fed. Cir. 2013)......................................................................6

*Jan's Helicopter Serv., Inc. v. F.A.A.*,
    525 F.3d 1299 (Fed. Cir. 2008)..................................................................17

*Lamie v. United States Tr.*,
540 U.S. 526 (2004)............................................................................................9

*Lummi Tribe of the Lummi Reservation v. United States*,
99 Fed. Cl. 584 (2011) ......................................................................................16

*Metro. Area Transit, Inc. v. Nicholson*,
463 F.3d 1256 (Fed. Cir. 2006).........................................................................20

*Moda Health Plan, Inc. v. United States*,
892 F.3d 1311 (Fed. Cir. 2018)................................................................ *passim*

*Montana Health Co-Op v. United States*,
No. 18-143C, 2018 WL 4203938 (Fed. Cl. Sept. 4, 2018)........................... *passim*

*Molina Healthcare of Cal., Inc. v. United States*,
133 Fed. Cl. 14 (2017) ......................................................................................22

*Prairie Cty., Mont. v. United States*,
113 Fed. Cl. 194 (2013) ......................................................................................6

*Radium Mines, Inc. v. United States*,
153 F. Supp. 403 (Ct. Cl. 1957).........................................................................19

*Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61 (2011)..............................................................................................9

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) (en banc)........................................................22

*Suburban Mortg. Assoc., Inc. v. HUD*,
480 F.3d 1116 (Fed. Cir. 2007).........................................................................18

*United States v. Langston*,
118 U.S. 389 (1886)........................................................................................7, 8

*United States v. Mottaz*,
476 U.S. 834 (1986) ..................................................................................... 17-18

*United States v. Testan*,
424 U.S. 392 (1976)..........................................................................................17

*United States v. White Mountain Apache Tribe*,
537 U.S. 465 (2003)......................................................................................5, 16

*Wolfchild v. United States*,
96 Fed. Cl. 302 (2010), *rev'd in part* 731 F.3d 1280 (Fed. Cir. 2013)..................16

**Statutes**

26 U.S.C. § 36B ...................................................................................................................12

28 U.S.C. 1491 ....................................................................................................................16

31 U.S.C. § 1324 .................................................................................................................12

42 U.S.C. § 18071 .....................................................................................................3, 6, 9, 12

**Rules and Regulations**

48 C.F.R. § 1.601(a)............................................................................................................20

**Other Authorities**

Defs.' Mem. ISO Mot. for Summ. J., *House v. Burwell*, Case No. 1:14-cv-01967-
      RMC, Dkt. No. 55-1 (D.D.C. filed Dec. 2, 2015)....................................................18

Plaintiff Maine Community Health Options ("Health Options") respectfully submits this Reply in support of its Motion for Summary Judgment and Opposition to Defendant's Cross-Motion to Dismiss.  For the reasons set forth in Plaintiff's Complaint and its Motion for Summary Judgment (Pl. Br.), Plaintiff Health Options is seeking relief in this Court because of the Government's refusal to honor the statutory requirement to reimburse certain cost-sharing reductions (CSR) that Health Options provided to its insureds under the Affordable Care Act (ACA).  After making the required CSR payments to Health Options (and many other health insurers) for 45 consecutive months, the Government stopped paying part way through the 2017 Benefit Year.  The Government had internally determined that the accounts from which it was making CSR payments were not properly used for such payments, and no other appropriations to support those payments had been made.  Thus, the U.S. Department of Health and Human Services (HHS) reasoned that it did not have a source of funds to make the payments.

Before the Court, as its defense for its failure to pay, the Government now argues that it was actually never obligated to make any of the CSR payments at all.  It says that Section 1402 did not mandate such payments.  The Government's theory is wrong, and its failure to make CSR payments for October, November, and December of 2017 is in direct violation of Section 1402 of the ACA.

In its response and cross-motion to dismiss (Govt. Br.), the Government makes a series of assertions in support of its position.  The Government first equates the existence of a statutory payment obligation with the separate question of how and from what accounts or appropriations that obligation is to be paid.  The Government argues, in essence, that Congress's failure to appropriate funds for Section 1402 obligations means that there is no obligation to make

payment in the first instance.  The Government's argument is flatly inconsistent with decades of precedent, recently and decisively reaffirmed by the Federal Circuit.

The Federal Circuit has put it clearly: "[I]t has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt."  *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1321 (Fed. Cir. 2018).  A clear statutory direction to pay establishes the existence of the obligation.  The failure to appropriate funds to an agency to make payments limits the ability of agency officials to make the payment, but it does not extinguish the obligation itself—which remains enforceable in this Court under the Tucker Act, giving rise to judgments payable from the Judgment Fund.  Section 1402 sets forth precisely such a clearly stated obligation to pay.

Even more recently, in response to identical Government arguments about the CSR program to those raised here, this Court (per Judge Kaplan) held that "the statutory language [of Section 1402] clearly and unambiguously imposes an obligation on the Secretary of HHS to make payments to health insurers that have implemented cost-sharing reductions on their covered plans as required by the ACA," and stated that "the government was statutorily obligated to provide . . . cost-sharing reduction payments for the remaining months of 2017," because "[t]hat obligation was not vitiated by Congress's failure to appropriate funds for that purpose."  *Montana Health Co-Op v. United States*, No. 18-143C, 2018 WL 4203938, at *5, *8 (Fed. Cl. Sept. 4, 2018).[1]

---

[1] *Montana Health* remains open for a final judgment awaiting the parties' agreement on quantum.  An additional CSR proceeding, raising the same merits issues presented here, *Sanford Health Plan v. United States*, No. 18-136, had been pending before Senior Judge Firestone.  Following issuance of Judge Kaplan's opinion in *Montana Health*, Judge Firestone *sua sponte* transferred *Sanford Health* to Judge Kaplan.  On or before October 4, the parties are to file a joint status report in *Sanford Health*.

The Government's theory that Congress never intended for CSR payments to be made simply won't hold water.  To begin with, the statutory text is the best indicator of congressional intent and here the text is clear and unambiguous:  Congress said, in Section 1402, that the Government "***shall make***" CSR payments.  42 U.S.C. § 18071.  Under *Moda*, and many decades of precedent from this Court, this Court's predecessor court, and the Federal Circuit, that language means what it says.  *See Montana Health*, 2018 WL 4203938 at \*5.

The Government purports to invoke *Moda* in support of its contention that the lack of an appropriation signals an intent not to create a substantive obligation.  That is flatly wrong. Nothing can be inferred from the mere lack of an appropriation.  Rather, the statutory language controls.  *See Moda*, 892 F.3d at 1320; *accord Montana Health*, 2018 WL 4203938 at \*5-\*6.  As the Federal Circuit held in construing language nearly identical to Section 1402 as creating an obligation, Congress's silence on the appropriation with which to fund that obligation does not negate it.  What the Government is citing in *Moda* is the portion of the Federal Circuit's opinion where it construed appropriations riders enacted years after the statutory obligation and, by statutory language, directly targeted the source of funds for that obligation.  The Federal Circuit construed that subsequent enactment (not the mere failure to appropriate) as negating and suspending that obligation.  That portion of *Moda* is inapposite here because there have been no subsequent statutory enactments on CSR payments, and thus there is no subsequent legislation to construe.

The Government also contends that Congress's intent that Section 1402 not obligate the United States can be gleaned from the fact that it funded the tax credits created by Section 1401 by adding them to a longstanding permanent appropriation for tax credits.  But precisely because, as *Moda* instructs, how Congress chooses to fund an obligation is distinct from whether it has

3

created an obligation in the first place, Congress's choice to fund a new tax credit in the same manner it has long funded other tax credits has no bearing on whether it intended Section 1402 to create an obligation.

The Government's argument that insurers like Health Options could increase their premiums to somehow offset the Government's failure to make CSR payments misses the mark. There is no reason to believe that the rate setting process, under state regulatory control, in any way negates the statutory obligation to make CSR payments.  They are separate matters. Moreover, the Government's argument reflects a fundamental misunderstanding of how insurance works.  Separate and apart from the lack of any statutory language supporting the Government's theory, by the time the Government decided to withhold CSR payments in October 2017, Health Options and other insurers had no recourse to summarily raise rates during the last quarter of the year in an attempt to make up the difference.  Indeed, when the Government made its announcement, premium invoices for October were a month old and November invoices were on their way out to subscribers.  Furthermore, Health Options and other insurers had already committed to participate in the marketplaces for 2018 under rates that had already been set and that were subject to regulatory approval without any anticipation that the Government would stop its payment of CSR obligations.  Even if taking such steps to make up for a possible loss of revenue could properly be considered a recoupment, it was simply not possible for Health Options to have "recouped" its losses for the periods at issue here.  The Government certainly does not suggest the contrary.

The Government's last attack on Health Options' statutory claim is that it is not enough for Health Options to show that it has a claim to payment under a money-mandating statute, because Health Options must also show that the statute specifically creates a distinct cause of

action to recover what is owed.  But this position is contradicted by the well-established rule that "the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc* in relevant part); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 477 (2003) ("To the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of *fair inference that the law was meant to provide a damages remedy for breach of a duty*." (emphasis added)); *accord Montana Health*, 2018 WL 4203938 at *4 n.5.  No separate damages provision is required for Health Options to bring suit.

The Government's challenge to Health Options' claim based on an implied-in-fact contract similarly misconstrues binding precedent.  Indeed, the Government utterly ignores the promissory nature of the CSR program—and the Government's conduct in fulfilling its promise for 45 consecutive months.  The Government also feebly contends that the QHPIAs, which evidence the existence of an implied-in-fact contract between Health Options and the Government, somehow rose to the level of the "express contracts" precluding any finding of an implied-in-fact contract.  The Government's position cannot be squared with controlling law.  Rather, the QHPIAs, together with statutes, regulations, and the Government's conduct, establish an implied-in-fact contract to make CSR payments, which the Government breached.

As set forth in Health Options' complaint, motion, and below, Health Options is entitled to summary judgment on its claims for CSR payments for benefit year 2017.  It follows, then, that the Government's motion to dismiss must also be denied because, on the uncontroverted

facts asserted, Health Options has stated a colorable claim for relief that can be redressed by a favorable decision from this Court. *See Prairie Cty., Mont. v. United States*, 113 Fed. Cl. 194, 198 (2013) (quoting *Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 954 (Fed. Cir. 2013)).  As a non-profit, member-led CO-OP created by the ACA to expand the availability of health insurance to the people of Maine, Health Options is particularly disadvantaged by the Government's failure to make the statutorily required payments.  Health Options is entitled to payment of $5,651,672.49 in CSR payments for benefit year 2017.

I.  **THE EXISTENCE OF A STATUTORY PAYMENT OBLIGATION UNDER SECTION 1402 IS A SEPARATE QUESTION FROM THE QUESTION OF WHETHER AN APPROPRIATION HAS BEEN MADE.**

Section 1402 of the Affordable Care Act (ACA) requires health insurance issuers like Health Options to make cost-sharing reductions to their insureds.  42 U.S.C. § 18071(a)(2) (issuers "shall reduce the cost-sharing" under the applicable plan).  It also mandates that the Government make payments to health insurance issuers for these cost-sharing reductions.  The statute is unambiguous:

> An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and the ***Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.***

42 U.S.C. § 18071(c)(3)(A) (emphasis added).

For 45 consecutive months, from January 2014 until October 2017, HHS duly "ma[d]e periodic and timely payments" to issuers, including to Health Options, "equal to the value of the reductions" that Health Options provided to its insureds.  In October 2017, the Attorney General opined that the general agency funds from which the agency had been making payments for nearly four years was not a proper source of funds for these purposes.  HHS acquiesced and cut off funds to make the required payments.  HHS thus stopped making CSR payments for the

remainder of the 2017 benefit year.  Health Options brought this action to obtain the payments

required by the statute for the plans that it had already issued and sold for 2017.

The Government argues that this is not simply a case of the Government refusing to pay

what it concededly owed.  Instead, the Government asserts that notwithstanding the statutory

directive that the Government "shall make" these payments, it has no statutory obligation to pay

because the statute did not contain additional language identifying an appropriation from which

to pay, supposedly reflecting a lack of "congressional intent" to obligate the United States in the

first instance.  The Government's arguments conflate the existence of the statutory obligation

with the entirely separate question of whether Congress has appropriated money to pay the

obligation.

The Government's position runs up against more than a century of precedent establishing

that the absence of an appropriation does not negate the Government's underlying obligation to

make payment.  *See United States v. Langston*, 118 U.S. 389 (1886); *Collins v. United States*, 15

Ct. Cl. 22, 35 (1879).  As explained in *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892):

> An appropriation *per se* merely imposes limitations upon the
> Government's own agents; it is a definite amount of money
> intrusted to them for distribution; but its insufficiency does not pay
> the Government's debts, nor cancel its obligations, nor defeat the
> rights of other parties.

The Government's arguments are, therefore, untenable, particularly in light of *Moda*.  In *Moda*,

the Federal Circuit addressed another provision of the ACA that uses nearly identical mandatory

payment language.  And consistent with historic precedent, the Federal Circuit panel

unanimously rejected arguments substantially identical to those that the Government makes here.

The first question posed in *Moda* was whether Section 1342 of the ACA obligated the

Government to make certain payments, irrespective of whether Congress appropriated funds for

the purpose.  The Federal Circuit said "yes," holding that the statutory requirement that "the

Secretary ***shall pay to the plan*** an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount" created an obligation to pay. *Moda*, 892 F.3d at 1332 (emphasis added). The court held that the "shall pay" language of Section 1342 was "unambiguously mandatory" and imposed a legal obligation on the United States. *Id.* at 1320. In so holding, the court reaffirmed the longstanding rule that the question of whether Congress has appropriated funds enabling the Government's *agents* (here, HHS) to pay an obligation is a question entirely distinct from Congress's creation of a statutory obligation in the first place. *Id.* at 1321 ("it has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt"); *id.* at 1322.

The Federal Circuit observed that there was no precedent supporting the Government's contrary position that the absence of an obligation can be inferred from the lack of appropriations or budgetary authority. *Id.* at 1322 ("The government cites no authority for its contention that a statutory obligation cannot exist absent budget authority."). Such a "rule would be inconsistent with *Langston*, where the obligation existed independent of any budget authority and independent of a sufficient appropriation to meet the obligation." *Id.*

Indeed, in *Moda*, the Government argued a variety of theories under which it asked the court to conclude that the failure to establish an appropriation would negate the existence of the obligation created by the plain language of the statute. But in light of the plain language, the Federal Circuit found all of those theories of "no moment" or "immaterial." *Id.* The "plain language of section 1342 created an obligation of the government to pay participants in the health benefit exchanges the full amount indicated by the statutory formula for payments out under the risk corridors program." *Id.*

The basic problem with the Government's argument on CSR is that whether one frames the question in terms of what the statute directs, or in terms of congressional intent, the first place to look for the meaning of the statute—and if the statute is unambiguous, the only place to look—is the words of the statute itself.  *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011); *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004).  The "shall make" directive of Section 1402 imposes an *unambiguously mandatory* payment obligation on the United States.  *See* 42 U.S.C. § 18071; *accord Moda*, 892 F.3d at 1320 (the "shall pay" directive of Section 1342 was "unambiguously mandatory"); *Montana Health*, 2018 WL 4203938 at *5 (same).  There is no material distinction between the words used by Congress in Section 1342 (at issue in *Moda*) and Section 1402 (at issue here).  The "shall make" language of Section 1402 is as mandatory as the "shall pay" language of Section 1342.  Both create an unmistakable obligation to pay.  And, as in *Moda*, the fact that Congress did not appropriate funds is insufficient to render that obligation ambiguous, or to undermine it in any way.

As explained in Health Options' motion and recently recognized in *Montana Health*, these same principles control the inquiry under the CSR program.  Applying the reasoning of the Federal Circuit in *Moda* to a CSR claim brought by Plaintiff Montana Health, the *Montana Health* court granted summary judgment to plaintiff as to liability and denied the government's motion to dismiss.  At the outset, the court reasoned that the statutory obligation to make CSR payments is clearly established by the "shall make" language of the statute, and no negative inference can be drawn from the failure to appropriate funds or establish budgetary authority.  *Montana Health*, 2018 WL 4203938 at *5.  Section 1402 plainly created an obligation to pay, and while a lack of appropriation may constrain the "government's own agents" (HHS) from

9

making payments, the underlying statutory payment obligation—and the United States'

obligation to make payment—is unaffected.  *See id.* at 8 (quoting *Moda*, 892 F.3d at 1321).

## II.   THE GOVERNMENT OFFERS NO VIABLE BASIS TO DISREGARD THE PLAIN LANGUAGE OF SECTION 1402, CREATING AN OBLIGATION, BASED ON CONGRESS'S MERE LACK OF APPROPRIATED FUNDS.

### A.   Congress Did Not Pass Any CSR Appropriation Riders, so the Government's Reliance on *Moda's* Discussion of Appropriation Riders and Legislative "Intent" Is Misplaced.

The Government proposes that this Court ignore the first part of *Moda*, which held that

equivalent language in Section 1342 of the ACA unambiguously created a payment obligation,

and asks this Court to focus on the portion of *Moda* that addressed *subsequent* legislation in the

form of appropriations riders, and the legislative history concerning those riders.  In that second

part of *Moda*, the Federal Circuit emphasized the importance of congressional intent in

interpreting later appropriation riders that took direct aim at the substantive obligation it agreed

was created by Section 1342.  The Federal Circuit determined that those riders had temporarily

suspended the obligation.[2]  The reference to that portion of *Moda* is misplaced, however,

because, unlike the provision at issue in *Moda*, Section 1402 was never the focus of a subsequent

appropriation rider.

*Moda* examined congressional "intent" in a very different context, with very different

evidence of legislative intent before it, to determine whether the "shall pay" obligation stated on

the face of Section 1342 of the ACA was overridden by subsequent enactments.  The Federal

Circuit sought to determine whether those *subsequent* enactments revealed Congress's "intent"

to limit the amount paid out in the risk corridors program.  *Moda*, 892 F.3d at 1322-23.  In

---

[2]  The portion of the *Moda* opinion addressing the effect of the appropriation riders is now the subject of various petitions for rehearing *en banc*, raising many of the points that Judge Newman made in her dissent from that portion of the decision.  892 F.3d at 1332-37.

examining those subsequent appropriation riders, the Federal Circuit noted a line of cases in which courts examined subsequent enactments, and specific legislative history concerning those enactments, to determine whether they abrogated existing statutory obligations.  In particular, the Federal Circuit examined the legislative history of those riders, including questions asked by Congress, GAO responses, and a statement by the Chairman of the House Appropriations Committee.  *Id.* at 1325.

No similar argument can be made here because:  (i) there is no subsequent legislation to construe; and (ii) the Government has proffered no legislative history at all to support its position.  Section 1402 means exactly what it says when it says that the Secretary "*shall make periodic and timely payments to the issuer equal to the value of the reductions*."  That obligation stands regardless of whether Congress has made appropriations to allow the agency to fulfill that obligation, and the Government has offered no reasonable basis on which the Court should disregard the clear statutory language at issue.

**B.     The Government's Various Theories for Equating the Absence of an Appropriation With the Absence of a Payment Obligation Are Without Merit.**

The Government tries to show that notwithstanding the plain language of Section 1402, Congress impliedly did not intend it to create a payment obligation under Section 1402.  As set forth below, those arguments do not lead logically to the conclusion that the Government seeks, namely that the plain language of the statute should be disregarded in favor of the Government's self-serving conception of congressional intent.  And all of those arguments ultimately rest on the premise, rejected in *Moda* and *Montana Health*, that the absence of an appropriation can be equated with the absence of an obligation, when the statute in question unambiguously creates an obligation.  *Moda*, 892 F.3d at 1320-22; *Montana Health*, 2018 WL 4203938 at *5.

11

### 1.   The comparison between Sections 1401 and 1402 does not address the issues here.

The Government first highlights differences between Sections 1401 and 1402, noting that in Section 1401, Congress identified a source of permanent funding for the tax credit created by that provision, but in Section 1402, Congress did not identify a permanent source of funding. The different treatment reveals only an intent of Congress to fund different obligations differently.

First, the fact that Section 1401 identifies a source of funding for the tax *credit* is wholly unsurprising.  Because it was a tax credit, appearing in a health care law, it should surprise no one that Congress funded the credit through the same longstanding appropriation used to fund tax credits of all sorts.[3]  But it is equally unsurprising that for the Section 1402 CSR payments Congress created an obligation yet left the funding of that obligation to future general appropriations to the agency or to specific periodic appropriations to come later.  Indeed, as the *Montana Health* court reasoned, "the lack of a permanent funding mechanism suggests that when it enacted the ACA, Congress anticipated that the CSR payments it obligated the government to pay in § 1402 would ultimately be funded through the annual appropriations process."  *Montana Health*, 2018 WL 4203938 at *7.  That is the point of *Moda* and the long line of cases it follows: how Congress funds an obligation is distinct from the existence of the obligation itself.  *Moda*, 892 F.3d at 1320-22.

---

[3]  Section 1401(a) enacted the tax credit provision, codifying it in the Tax Code at 26 U.S.C. § 36B.  A different subsection, Section 1401(d), enacted the permanent appropriation for that tax credit, by amending 31 U.S.C. § 1324(b), part of the U.S. Code title that deals with appropriations and other budgetary matters.  The cost-sharing reduction requirement of Section 1402, for its part, is codified at 42 U.S.C. § 18071, a title that deals broadly with public health and welfare.  Section 1402, as the Government acknowledges, does not concern a tax credit, so there would be no reason for Congress to fund reimbursement payments for cost-sharing reductions as it has funded tax credits for many years, Section 1401 just being the latest.

Second, and more important, all that the comparison between Section 1401 and Section 1402 shows is that under one of the sections, Congress did designate an appropriation, and under the other, it did not. The difference in language between the sections means no more than what the two provisions say: for Section 1401, Congress established a specific funding mechanism, but for Section 1402, it did not do so.

The Government also asserts that the Court should not "infer that Congress intended to create a statutory entitlement to CSR payments that could only be collected through after-the-fact litigation." Govt. Br. at 18. But the Government's premise is flawed. The fact that Congress did not designate an appropriation in 1402 did not mean that an appropriation would not be provided later, as needed, or found in some other appropriation properly available to the agency. Nor is it logical to believe that Congress created this clear statutory obligation, induced insurers to rely on it, but never intended to make good on it at all. The fact that the Government *made* CSR payments for nearly four years illustrates the fallacy of the Government's current litigating position. In any event, the Federal Circuit in *Moda* reiterated that the absence of an appropriation mechanism does not relieve the Government of the obligation to make payment. 892 F.3d at 1322.

This Court is positioned to enter judgment based on the existence of a clearly stated statutory obligation; how the obligation is to be paid is ordinarily not the responsibility of the Court. "Whether it is to be paid out of one appropriation or out of another; whether Congress appropriate[ed] an insufficient amount, or a sufficient amount, or nothing at all, are questions which are vital for the accounting officers, but which do not enter into the consideration of a case in the courts." *Gibney v. United States*, 114 Ct. Cl. 38, 52 (1949).

### 2.      The Government's "increasing premiums" theory is erroneous.

The Government asserts that since "the structure of the ACA" "allow[s] issuers to recoup their cost-sharing reduction expenses by raising premiums"—at least on a prospective basis— this somehow undermines Section 1402's payment obligation.  Govt. Br. at 3.  For support, the Government cites the fact that a federal district court denied a request for a preliminary injunction directing HHS to resume Section 1402 payments on grounds that states could prospectively authorize insurers to increase premiums *for 2018*.  *Id*. at 20.  In other words, that district court held that the possibility that insurers could increase premiums to offset a prospective loss of CSR payments, and increase their tax credit recovery, affected the equitable balance whether to grant an injunction.

The decisive point here in response to the Government's structural argument is that there is no indication that Congress ever actually conceived, considered, or "intended" such a possible mechanism to offset prospective losses through premium increases approved by the States, and tax credits when it enacted Section 1402.  And the possibility that a cut-off of CSR payments will be reflected in state-approved premiums is far too thin a reed on which to rest a conclusion that in directing that the Secretary "shall make payments," Congress did not intend what it plainly said.  Premium setting and approval is assigned to the States, and thus largely outside the scope of the ACA, and there is no indication that it had any role in the design of Section 1402. *See Montana Health*, 2018 WL 4203938 at *7 (rejecting Government's argument because "[t]here is no evidence in either the language of the ACA or its legislative history that Congress intended that the statutory obligation to make CSR payments should or would be subject to an offset based on an insurer's premium rates.").  The Government's contention that a contrary position means issuers could somehow double recover, Govt. Br. at 3, 20, is a red herring in light of both the statutory language and regulatory reality.

The recovery sought in this case is solely for the Section 1402 payments that the Government failed to make for the final calendar-year quarter of 2017.  Health Options was not paid what it was owed when the Government ceased making Section 1402 payments in October 2017.  The Government's decision to halt payment occurred long after Health Options had committed to provide insurance, under rates that were set, on the understanding that the CSR payments would be made, and which could not be altered.  Health Options was still required by law to provide cost-sharing reductions to eligible insureds, despite not receiving the mandated reimbursement from the Government.  Health Options has no opportunity to recoup those lost payments since premiums are set (with regulatory approval) prospectively based on anticipated costs for the upcoming plan year.  *Montana Health*, 2018 WL 4203938 at *7.  The Government does not contest that Health Options' 2017 rates could not be changed when the Government stopped making CSR payments in October 2017, or that Health Options was forced to bear its share of cost-sharing reductions *and* the Government's share.

### C.     Recovery of Amounts Due From the Government's Failure to Make CSR Payments Are Actionable in the Court of Federal Claims.

The Government argues that jurisdiction is different from a cause of action and that if Congress did not provide a "damages remedy" for insurers in Section 1402, the case cannot proceed.[4]  Govt. Br. at 17-22.  In so arguing, the Government effectively asks this Court to ignore the bedrock rule that where the claim to relief arises from a money-mandating statute, that money-mandating statute provides both the basis for jurisdiction and the cause of action.

> If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court

---

[4]  Indeed, if that were true, the *Moda* decision would make no sense.  The Federal Circuit there could simply have stated that although there was a money-mandating statute creating an obligation, there was no additional statutory provision creating a cause of action, and stopped at that.

> shall declare that it has jurisdiction over the cause, and shall then
> proceed with the case in the normal course.  For purposes of the
> case before the trial court, the determination that the source is
> money-mandating shall be determinative both as to the question of
> the court's jurisdiction and thereafter as to the question of whether,
> on the merits, plaintiff has a money-mandating source on which to
> base his cause of action.

*Fisher*, 402 F.3d at 1173 (*en banc* in relevant part); *see also White Mountain*, 537 U.S. at 477

(rejecting the requirement for an explicit provision providing for money damages under the

Tucker Act and holding that a fair inference that the law was meant to provide a damages

remedy is all that is required); *Greenlee Cty., Ariz. v. United States*, 487 F.3d 871, 877 (Fed. Cir.

2007); *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584, 594 (2011);

*Wolfchild v. United States*, 96 Fed. Cl. 302, 339 (2010), *rev'd in part* 731 F.3d 1280 (Fed. Cir.

2013); *accord Montana Health*, 2018 WL 4203938 at *4 n.5 ("Plaintiffs have never been

required to make some separate showing that the money-mandating statute that establishes this

court's jurisdiction over their monetary claims also grants them an express (or implied) cause of

action for damages."). Indeed, the very reason for this Court's Tucker Act jurisdiction is to

provide a means of recovery where a statute creates a right to compensation and the Government

has not paid.

The Government's position is fundamentally inconsistent with the basic structure of this

Court's jurisdiction.  The Tucker Act, 28 U.S.C. 1491(a)(1), waives sovereign immunity for

claims predicated on the Constitution, federal statutes and regulations, and contracts with the

Government.  Where this Court has before it a money-mandating statute, and the claimant seeks

payment for damages incurred, that mandate is what gives the plaintiff a right to relief in this

Court, if it prevails on its claim.  It is the claim for damages under a money-mandating statute

that provides the right to recovery.  There is no need for an *additional* "express cause of action

for damages." Govt. Br. at 19. Rather, the right to relief is implied from the money-mandating statute, and the claim for damages actually incurred.

Thus, even before *Fisher*, in *Greenlee County*, for example, the court held that identical language—the "the Secretary of the Interior *shall make a payment*" to local governments to compensate them for losses due to the presence of tax-exempt federal land—was money-mandating. 487 F.3d at 876-77 (emphasis added). "We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Id.* at 876-77 (citing *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003)). And since a money-mandating statute "creates the right to money damages," *id.* at 875; *see also Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (recognizing the right of a "class of plaintiffs entitled to recover under the money-mandating source"), Health Options is entitled to pursue its right to recover what it is owed under the money mandating provisions of Section 1402.

The Government's argument is actually belied by its own citation to *Bowen v. Massachusetts*, 487 U.S. 879, 905 n.42 (1988). There, the Court recognized that "shall" pay statutes generally provide a "self-enforcing" right to recover under the Tucker Act where they "mandate[] compensation by the Federal Government for the damage sustained." *Id.* (*citing Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 1009 (1967) (cited with approval in *United States* v. *Testan*, 424 U.S. 392, 398, 400 (1976)). That is the case here. The money-mandating statute provides reimbursement for the cost-saving reductions that Health Options was statutorily required to grant to insureds, and which it did grant to its insureds. It thus provides compensation for a past act, which is the "essence of a Tucker Act claim for monetary relief."

*Id.* (citing *United States v. Mottaz*, 476 U.S. 834, 850-851 (1986) (suit to require the government to purchase property is not a form of compensation for past acts)).[5]

Indeed, the Department of Justice itself acknowledged the application of this principle to the CSR program in *Burwell*, when it noted the right and ability of insurers to do exactly what Health Options is doing here.  In *Burwell*, the Government acknowledged that the ACA "requires the government to pay cost-sharing reductions to issuers," and explained to the district court that "[t]he absence of an appropriation would not prevent the insurers from seeking to enforce that statutory right through litigation."  Defs.' Mem. ISO Mot. for Summ. J., *House v. Burwell*, Case No. 1:14-cv-01967-RMC, Dkt. No. 55-1 (D.D.C. filed Dec. 2, 2015) at 20.  The Government further acknowledged that prevailing insurers "can receive the amount to which it is entitled from the permanent appropriation Congress has made in the Judgment Fund . . . .  The mere absence of a more specific appropriation is not necessarily a defense to recovery from that Fund."  *Id*.

## III.    THE GOVERNMENT IS LIABLE FOR BREACH OF AN IMPLIED-IN-FACT CONTRACT.

The Government's contention that it has no implied-in-fact contract with Health Options is also contrary to controlling precedent.  Each Government argument reflects a

---

[5]  The claim at issue in *Bowen*, in contrast, did not seek damages; it arose from an administrative review procedure that was more appropriately subject to Administrative Procedure Act review in the district court.  *See Bowen*, 487 U.S. at 905 n.42.  As the Federal Circuit subsequently reasoned, "when the plaintiff's claims, regardless of the form in which the complaint is drafted, are understood to be seeking a monetary reward from the Government, then, for the reasons explained, a straightforward analysis calls for determining whether the case falls within the jurisdiction of the Court of Federal Claims.  If that court can provide an adequate remedy—if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is not a district court under the APA but the Court of Federal Claims under the Tucker Act."  *Suburban Mortg. Assoc., Inc. v. HUD*, 480 F.3d 1116, 1126 (Fed. Cir. 2007).  That is precisely the case here.

misunderstanding or misapplication of longstanding precedent and improperly ignores the Government's own conduct.

First, the Government's position that the CSR program is simply a "benefits program" cannot be squared with prevailing law or the operative facts, both of which establish that statutory schemes that ***are promissory in nature***—like the CSR program—give rise to contractual obligations to make the requisite payments.  As set forth in Health Options' Motion for Summary Judgment, the Government's program is precisely the type of *quid pro quo* arrangement found to constitute an implied-in-fact contract in *Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957).  There, the regulation at issue was designed to "induce" certain conduct.  *Id.*; *Hanlin v. United States*, 316 F.3d 1325, 1329 (Fed. Cir. 2003) (observing that a statute or regulation could give rise to an implied-in-fact contract based on, among other things, "words of promissory character in the statute or regulation that manifested an undertaking or commitment rather than a mere instruction, prediction or intention").  Here, the Government sought to induce participation in a brand new health insurance marketplace, the costs of which insurers could not reliably predict, and Section 1402 required insurers to provide certain reductions to purchasers, in exchange for receiving the promised payments.

The Government's complaint that the statutory language establishing the CSR program does not "speak in terms of contract," Govt. Br. at 22, misses the mark.  *Radium Mines* was not based on the regulation's express reference to a possible contract.  Rather, as this Court noted, the "key" to *Radium Mines* "is that the regulations at issue were promissory in nature."  *Baker v. United States*, 50 Fed. Cl. 483, 490 (2001).  The CSR program was promissory in nature because, among other things, it was specifically designed to induce participation in the marketplaces by Health Options and other insurers.  Pl. Br. at 17-24.  If you do this, we will give

19

you that; if you provide the desired policies and grant the statutorily-required reductions in cost sharing, and make timely submissions, we will timely provide Section 1402 reimbursements. The Government's threadbare invocation of the general presumption against interpreting statutory language as creating contractual rights is unavailing.

Instead of addressing the program's promissory nature, the Government relies heavily on *Moda*, while ignoring a key distinction between the Government's conduct under the risk corridors program and here with the Section 1402 CSR program.  Not only did the Government promise to make CSR payments in exchange for Health Options' acceptance and performance of certain specified duties, but also *the Government in fact fulfilled its promise for 45 months*. The Government cannot escape its own course of conduct confirming the terms of the exchange by the parties.  It is, of course, a fundamental principle of contract law that "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, *any course of performance accepted or acquiesced in without objection* is given great weight in the interpretation of the agreement."  *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (emphasis in original) (quoting Restatement (Second) of Contracts § 202(4)). Regardless of the Government's current litigating position, it appears to have agreed with Health Options that it had made a promise and, until recently, kept that promise to pay.[6]

Second, the Government's argument that the QHPIA agreements were "express" contracts that preclude any finding of a bilateral implied-in-fact contract is equally misguided.

---

[6]  The Government's argument that HHS lacked contracting authority ignores the fact that, as set forth in Health Options' Motion, actual authority can be express *or implied*.  Pl. Br. at 20-21. For the reasons set forth therein, the Secretary had both express and implied authority to enter into contracts.  The Government confuses "actual authority" of the HHS Secretary (to enter contracts) with whether entering into QHPIA contracts was potentially unauthorized under the Anti-deficiency Act; "actual authority" exists as a function of position, 48 C.F.R. § 1.601(a).

The Government posits that the QHPIA agreements were "express" contracts because they "established the relevant contractual parameters of plaintiff's offering of QHPs on an Exchange." Govt. Br. at 25.

But the Government's premise is flawed, and the argument collapses, because the QHPIA agreements were not express contracts of the kind that would preclude a finding of implied contract that goes far beyond the terms of whatever was in the QHPIA.  The QHPIA agreement: (1) memorializes that the insurer is properly licensed and certified to sell health plans on the Exchange, and (2) sets forth standard rules for insurers to maintain data security and private patient information.  QHPIAs do not contain any essential contract terms regarding payment, delivery, quantity, or performance.  While they purport to be agreements, they do not contain any indicia of the Government's reciprocal obligations or consideration.  Nothing within the four-corners of the QHPIA purports to be a "contract" with the U.S. Government.  As the Government acknowledged, the QHPIAs contained some of "the relevant contractual parameters of plaintiff's offering of QHPs on an Exchange," Govt. Br. at 25, but what the Government overlooks is that those nebulous "parameters" do not contain the essential terms of an *express* contract.  Mere agreements or MOUs with the Government may evidence implied-in-fact contracts, but they are not "express" contracts.  *See, e.g., Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346-47 (Fed. Cir. 2001) (although forbearance letters do not constitute an express contract with the government, they constitute contemporaneous document evidencing the necessary elements of an implied-in-fact contract).  Moreover, in *Molina Healthcare*, the Court of Federal Claims specifically examined whether QHPIA agreements were "express contracts" and held that they were not.  *Molina Healthcare of Cal., Inc. v. United States*, 133 Fed. Cl. 14, 46 (2017) (holding instead that there *was* an implied-in-fact contract).

Rather, as explained by Health Options, the full gamut of essential terms constituting the parties' implied-in-fact contractual bargain were specified and set forth in various statutory and regulatory provisions that preceded the QHPIA and, collectively, formed the parties' implied-in-fact contract.  Specifically, the QHPIAs contain some of the insurers' compliance obligations (a portion of the quid) that the insurers complied with in exchange for the statutory payment terms set forth elsewhere (the quo).  While the QHPIA agreements were not express contracts, they *were components* of the parties' implied-in-fact unilateral or, alternatively, bilateral, contract.

As such, the Government's assertion that Health Options' implied contract with the Government is "precluded" by the QHPIAs is untenable.  In each cited case the plaintiffs had ***already signed express contracts*** (and were simply trying to evade those plain terms by alleging implied side-agreements).  *See, e.g.*, *Durant v. United States*, 16 Cl. Ct. 447, 451-52 (1988) (because an "***express*** contract, Form ASCS–477, ***existed*** between the parties," plaintiffs could not allege overlapping implied contract (emphases added)); *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc) (because plaintiffs had already "agreed in ***an express, written contract*** to be bound[,]" their allegations of implied agreements was "foreclosed" (emphasis added)).  Those cases have no relationship to the situation where the parties had never signed "express" contracts setting forth the basic terms of the *quid pro quo*.

## **CONCLUSION**

For the reasons stated, Health Options is entitled to receive, and the Government is obligated to pay, $5,651,672.49 in CSR payments.  The Government's motion to dismiss should therefore be denied, and the Court should grant summary judgment for Health Options.


Dated: October 4, 2018

Respectfully submitted,

*/s/ Stephen McBrady*
Stephen McBrady
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
OF COUNSEL:                                       Tel: (202) 624-2500
Daniel Wolff                                           Fax: (202) 628-5116
Skye Mathieson                                     SMcBrady@crowell.com
Monica Sterling
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500


*Counsel for Maine Community Health
Options*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 4, 2018, a copy of the forgoing reply in support of Plaintiff's motion for summary judgment and opposition to Defendant's cross-motion to dismiss was filed electronically using the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing will be served on Defendant's Counsel via the Court's ECF system.

*/s/ Stephen McBrady*
Stephen McBrady
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116
SMcBrady@crowell.com